KASSI TCHANKPA,

          **Plaintiff,**

    **v.**

ASCENA RETAIL GROUP, INC.,

          **Defendant.**

**Case No. 2:16-cv-895**
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

Kassi Plaintiff ("Plaintiff"), brings this pro se action against his former employer, Ascena Retail Group ("Defendant"), alleging violations of the Americans With Disabilities Act, as amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. § 12101, *et seq.* and the Ohio Civil Rights Act, O.R.C. § 4112.01, *et seq.* Plaintiff also alleges several state law claims predicated on the denial of his claim for workers' compensation benefits. The matter is before the Court on Defendant's motion seeking summary judgment (ECF No. 73), and Plaintiff's motions seeking partial summary judgment (ECF Nos. 69, 70, 71), all of which have been fully briefed and are ripe for review. For the reasons that follow, Defendant's motion (ECF NO. 73), is **GRANTED,** and Plaintiff's motions (ECF Nos. 69, 70, 71), are **DENIED.** Defendant's Motion for an Extension of Time to Complete Pre-Trial Filings (ECF No. 80), and Plaintiff's Motion for the Appointment of Counsel (ECF No. 81), are also **DENIED** as moot in light of this Opinion and Order.

## I. BACKGROUND

Plaintiff is an information technology professional who lives in Canal Winchester, Ohio. (Deposition of Kassi Tchankpa, ECF 63–3, at PAGE ID # 537; ECF 63–4, at PAGE ID # 698–702.) Defendant provides retail merchandise to customers through several brands, including a brand of merchandise for teen girls operated by Tween Brands, Inc. ("Tween"). (Tchankpa Dep, ECF 63-3, at PAGE ID # 548–49.) In March of 2011, a temporary employment agency placed Plaintiff with Tween as a full-time database administrator. (*Id.*) During that placement, Plaintiff physically worked at Ascena's home office in New Albany, Ohio, where he collaborated with other members of a database administration team supervised by Manish Patel. (*Id.* at PAGE ID # 549, 550.) Plaintiff's duties included database support, backup, recovery, data manipulation and retrieval, customer support, and software installation. (*Id.* at 549.)

After Tween indicated that it was satisfied with Plaintiff's placement performance, Plaintiff applied for and accepted an offer to work as a full-time Tween employee beginning on July 11, 2011. (*Id.* at PAGE ID # 550; ECF No. 63–4, at PAGE ID #703–04.) As a Tween employee, Plaintiff continued to report to Patel. (Tchankpa Dep., ECF No. 63–3 at PAGE ID # 550.) Plaintiff's duties continued to include providing database support while he worked at Ascena's home office in New Albany during business hours and providing remote database support when he was on-call during non-business hours. (*Id.* at 550, 555–56.) Plaintiff also managed several software applications and did project work, including building databases for Defendant's business partners. (*Id.* at 551–52.)

On October 10, 2012, Plaintiff sought a prescription for anti-malarial drugs from Dr. Benjamin Hagan in anticipation of an overseas trip. (ECF No. 73-1, at PAGE ID # 2064.) At that office visit, Plaintiff complained that he had been experiencing bi-lateral shoulder pain for

2

approximately four weeks caused by "stretching on the computer." (*Id.* at PAGE ID # 2065.) Although Dr. Hagan found that Plaintiff had normal range of motion in the shoulder and upper arm, he prescribed two topical pain relievers. (*Id.*) Dr. Hagan's medical records do not contain any work restrictions. (Id. at PAGE ID # 2064–66.)

On January 2, 2013, Plaintiff saw Dr. John William Diehl and complained that he had neck pain that was made worse when he "[d]oes work at a computer 8-10 hours a day" and pain in his shoulder that had started about two months prior when he removed his computer from his car and he heard a pop. (ECF No. 73-2, at PAGE ID # 2069.)[1] Dr. Diehl found that Tchankpa experienced pain in his left shoulder with abduction and flexion. (*Id.*) After reviewing an x-ray and an ultrasound, Dr. Diehl's diagnosed neck pain, cervical strain, pain in the left shoulder region, and bursitis/tendonitis in the left shoulder. (*Id.* at Page ID # 2070.) Dr. Diehl planned to work with physical therapy to evaluate and strengthen Plaintiff's neck and he prescribed physical therapy to strengthen Plaintiff's left shoulder. (*Id.*) Plaintiff also received a steroid injection. (*Id.* at PAGE ID # 2071.) Dr. Diehl's records do not, however, contain any work restrictions. (*Id.* at PAGE ID # 2069–72.)

The parties agree that in early January of 2013, Plaintiff spoke to his supervisor, Patel, about his medical issues. Plaintiff alleges that during that discussion, he told Patel that he wanted to work from home three days a week to accommodate his medical issues. (Tchankpa Dep., ECF No. 63-3, at PAGE ID # 562–63.) Patel indicated that Plaintiff would need to provide medical documentation. (*Id.* at PAGE ID # 560, 562–63.) Plaintiff does not allege, and

---

[1] This record was later amended on November 8, 2013, to "[d]isregard statement 'since that happened 2 months ago' " to reflect that per Plaintiff, he was injured at work in December of 2012. (ECF No 73-2, at PAGE ID # 2072.)

the record does not reflect, that Plaintiff told Patel that his medical issues were due to a workplace injury during that discussion.

Plaintiff sought treatment from Dr. Hagan again on February 1, 2013. (ECF No. 73–1, at PAGE ID # 2062–63. Despite having undergone one week of physical therapy, Plaintiff reported that his pain was getting worse. (*Id.* at PAGE ID # 2062.) Dr. Hagan found that Plaintiff had a limited range of motion in his shoulder and upper arm secondary to pain. (*Id.*) Because he suspected a rotator cuff tendinopathy, Dr. Hagan requested an MRI and prescribed once-a-day Mobic tablets. (*Id.* at PAGE ID # 2063.) His notes do not, however, indicate that Plaintiff had any work restrictions. (*Id.* at PAGE ID # 2062–63.)

Although Plaintiff attended a second physical therapy session on February 7, 2013, he was subsequently discharged from physical therapy on February 27, 2013, after he failed to attend his therapy appointments. (ECF No. 73-3, at PAGE ID # 2074.) One day after being discharged, Plaintiff saw Dr. Brian Davison and complained that he had started experiencing shoulder pain on October 28, 2012, when he reached for a laptop and felt a sharp pain in his shoulder. (ECF No. 73-4, at PAGE ID # 2077.) Plaintiff also complained that his arm was stiff and had shrunk after he received a steroid injection from a previous doctor. (*Id.*) Dr. Davison found that Tchankpa's left shoulder had a restricted range of motion and diminished strength with internal and external rotation. (*Id.*) Dr. Davison also noted stiffness in Tchnakpa's left shoulder and opined that any possible change in the size was probably due to disuse. (*Id.*) Dr. Davison's impression was that Plaintiff had anthrofibrosis, and likely rotator cuff tendonitis and syndrome in the left shoulder. (*Id.*) Dr. Davison wrote that Plaintiff needed to work on regaining flexibility and he recommended physical therapy to help Plaintiff regain a full range of motion followed by strengthening as Plaintiff's range of motion improved. (*Id.*) Dr. Davison

4

also prescribed Tramadol for pain before and after physical therapy sessions. (*Id.*) He did not, however, indicate that Plaintiff had any work restrictions. (*Id.* at PAGE ID # 2076–77.)

Defendant worked with Plaintiff with regard to his medical issues. (Tchankpa Dep., ECF 63–3, at PAGE ID # 560, 563.) Specifically, Plaintiff testified that he provided Patel with all of his medical records, and Patel accommodated him by allowing him to leave early or come in late whenever he had medical appointments. (*Id.* at PAGE ID # 563; Amended Complaint, ¶ 12, ECF No. 22 at PAGE ID # 115–16.) Patel even allowed Plaintiff to occasionally work remotely when "something came up." (Tchankpa Dep., ECF 63–3, at PAGE ID # 560.) Plaintiff testified that he was allowed to either make up the time that he missed for appointments by working earlier or later than normal or he took "sick leave." (*Id.*) Patel did not, however, approve Plaintiff's request to work from home three days a week.

Because Patel did not approve Plaintiff's request to work from home, Plaintiff met with human resource manager, Jodi Null, in early May of 2013. (*Id.* at 562–63, 571.) When Null asked Plaintiff why he needed to work from home, Plaintiff told her that he had been injured at work. (*Id.* at 571.) Plaintiff also indicated that he had been paying for his treatments with his employer-provided health insurance. (*Id.*) Null explained that because Plaintiff was being treated for a workplace injury, he needed to seek reimbursement for his treatments through Defendant's self-insured workers' compensation plan instead of his health insurance plan. (*Id.*) After that meeting, Plaintiff spoke to a loss prevention officer on May 9, 2013, and reported that he had been injured at work on December 21, 2012. (ECF No. 63–4, at PAGE ID # 785.) Plaintiff explained that while packing up his belongings to go home, he lifted a laptop with his left arm and felt a "pop" in his left shoulder, and that although he thought nothing of it at the time, he had subsequently sought treatment from Drs. Hagan, Davison, and Diehl. (*Id.*) On May

5

15, 2013, Defendant told Plaintiff that a workers' compensation claims adjustor would contact him to discuss the details of his injury. (ECF No. 63–5, at PAGE ID # 922.)

At a physical therapy session on May 29, 2013, Plaintiff reported that although he felt a little better since his last therapy session, pain continued to prevent him from sleeping on his left side, his pain was most aggravated by overhead reaching, and that it was difficult for him to turn a steering wheel with his left upper extremity. (ECF No. 70–6, at PAGE ID # 1460.) The therapist's notes indicate that Plaintiff had decreased activities of daily living, strength, flexibility, joint mobility, range of motion, and soft tissue mobility as well as faulty posture, increased pain, inflammation, and swelling. (*Id.* at PAGE ID # 1461.) The notes do not, however, include any work restrictions and instead state that Plaintiff indicated that he worked with computers daily and was able to do all his duties. (*Id.* at PAGE ID # 1460.)

Plaintiff requested and received permission to be away from work from June 17, 2013, through July 15, 2013, while he vacationed out-of-state. (Tchankpa Dep., ECF 63–3, at PAGE ID # 575; ECF No. 63–5, at PAGE ID # 916–17.) Plaintiff used a combination of paid time off and a leave of absence to cover that time. (ECF No. 63–5, at PAGE ID # 916–17.) Plaintiff apparently did not see any doctors or attend physical therapy sessions while vacationing, but he attended a physical therapy session on July 30, 2017. (ECF No. 63–5, at PAGE ID # 918–21.) During that session he reported that pain still prevented him from sleeping on his left side and that his pain was aggravated by driving, movements above the shoulder, and reaching behind or overhead. (*Id.* at PAGE ID # 918.) The physical therapist wrote that Plaintiff exhibited decreased range of motion in all directions and that his functional ability to handle objects was at least twenty per cent, but less than 40 per cent, impaired. (*Id.* at PAGE ID # 920.) The therapy session notes do not, however, include any work restrictions. (*Id.* at PAGE ID # 918–20.)

6

On August 19, 2013, a workers' compensation benefits adjustor contacted Plaintiff. (Tchankpa Dep., ECF No. 63–3, at PAGE ID # 578.) The adjustor made it clear that Plaintiff needed to submit his medical records for his workers' compensation claim. (*Id.*)

On September 30, 2013, Plaintiff was evaluated by Dr. Ronald Stacy because Drs. Hagan, Davison, and Diehl were not approved workers' compensation providers. (*Id.* at PAGE ID # 579.) In a note dated that same day, Dr. Stacy certified that Plaintiff was under his care and that in order to avoid aggravating his condition, he needed to be allowed to leave work at 3:00pm on October 1, 2013. (ECF No. 63–5, at PAGE ID # 923.) Dr. Stacy's September 30, 2013, note does not contain any additional work restrictions. (*Id.*)

On October 2, 2013, Plaintiff met with Patel in a cafeteria to discuss his workers' compensation claim and "the plan for the future." (Tchankpa Dep., ECF No. 63–3, at PAGE ID # 564.) Plaintiff asked again if he could work from home three days a week and if he could be transferred to another position that would allow him to work from home. (*Id.* at PAGE ID # 564, 568; Amended Complaint, ¶ 13, ECF No. 22 at PAGE ID # 116.) Plaintiff asserts that Patel refused to accommodate either request. (Tchankpa Dep., ECF No. 63–3, at PAGE ID # 568.) Plaintiff also asserts that he told Patel he was going to go to human resources, and that Patel consequently became irritated and threatened to call security and have Plaintiff thrown out of the building. (*Id.*) At that point, Plaintiff returned to his desk and Patel contacted Melissa Lester in human resources. (*Id.*) Lester asked Plaintiff to come to her office where she met with both Plaintiff and Patel. (*Id.*) Plaintiff told Lester about his request to work from home or transfer and he complained about his interaction with Patel. (*Id.*) Plaintiff asserts that Lester told him he needed to use paid time off whenever he left work for treatments and that if he left work for treatment and did not have any paid time off to cover his time away from work, he would be

7

fired. (*Id.*) Plaintiff also acknowledged that during that discussion, Lester told him he needed to talk to his doctor and provide medical documentation to support his requests. (*Id.* at PAGE ID # 581–82.)

Plaintiff met again with Lester the next day, October 3, 2013. (*Id.* at PAGE ID # 579.) Patel's supervisor, Dennis Moore, also attended that meeting. (*Id.*) Plaintiff asserts that Moore categorically denied his request to work at home or to transfer and that Moore told him that he could quit if he was not happy. (*Id.* at PAGE ID # 580.) Plaintiff asserts that Moore also brought up work performance issues. (*Id.*)

On October 4, 2013, Dr. Stacy's request to be reimbursed for Plaintiff's proposed treatment through workers' compensation was denied pending further investigation. (ECF No. 73–6, at PAGE ID # 2082.) The record reflects that Defendant attempted to secure a signed medical records release form from Plaintiff in October of 2013 so that it could investigate Plaintiff's workers' compensation claim and his request to work at home or be transferred. (ECF No. 73–5, at PAGE ID # 2078–81; ECF No. 63–5, at PAGE ID # 924–27; 928–31.) On October 7, 2013, Lester sent letters to Plaintiff and Dr. Stacy indicating that Defendant wanted to work with Dr. Stacy to determine the nature of any restrictions caused by Plaintiff's medical conditions and any possible job accommodations. (ECF No. 63–5, at PAGE ID # 924–27; 928– 31.) Lester also asked Plaintiff to sign forms allowing Dr. Stacy to release Plaintiff's medical records. (*Id.* at PAGE ID # 924–27.) Defendant asserts that Plaintiff did not submit a signed medical records release form in October of 2013. The record contains no evidence to the contrary.

Although Plaintiff did not provide the requested release, on October 17, 2013, he sent Defendant a report executed by Dr. Stacy on October 10, 2013. (ECF No. 63–5, at PAGE ID #

8

932–35.) Dr. Stacy's October 10, 2013, report indicated that Plaintiff had temporary work restrictions, including that although he could occasionally lift as much as ten pounds, he could never lift more than that and he could never engage in pushing or pulling. (*Id.* at PAGE ID # 933.) Plaintiff was also limited to occasional bending, overhead reaching, typing, and driving automatic vehicles, but he could never drive standard vehicles. (*Id.*) Plaintiff was also able to sit, walk or stand for eight hours a day with breaks. (*Id.*) The report did not, however, describe the frequency or duration of the breaks that Plaintiff needed. (*Id.*) Accordingly, Defendant sought specific information about the break restriction from Plaintiff and Dr. Stacy. (*Id.* at PAGE ID # 936–38.) Plaintiff testified that after break-related communications took place in mid-October, he waited to hear whether his need for breaks would be accommodated. (Tchankpa Dep., ECF No. 63–3, at PAGE ID # 586.) Plaintiff was never told, however, that he could not take breaks, he could not recall being prevented from taking breaks, and he was generally able to get up to get water, use the restroom, and go to the cafeteria for lunch. (*Id.* at PAGE ID # 586–87.)

On October 18, 2013, Plaintiff asked if he would be able to take time off for treatment. (ECF No. 63–5, at PAGE ID # 936–37.) Plaintiff also inquired about unpaid leave. (*Id.* at PAGE ID # 937.) Lester informed Plaintiff that per her prior discussions with him on October 2, 2013, and October 3, 2013, Plaintiff needed to use paid time off or have qualified a leave of absence if he needed to miss work. (*Id.*) Lester encouraged Plaintiff to explore whether he could obtain a such a leave by getting in touch with another employee. (*Id.*) Plaintiff knew that he had to submit medical documentation in order to receive such a leave. (Tchankpa Dep., 63–3, at PAGE ID # 587.) Plaintiff did not, however, apply for a leave and instead continued to use paid time off when he was away from work after that. (*Id.*)

9

On November 5, 2013, Plaintiff signed a medical records release form for his workers' compensation claim. (ECF No. 63–5, at PAGE ID # 939–41.) On November 18, 2013, Defendant's third-party leave administrator sent Plaintiff information about how to report a leave of absence. (ECF No. 63–5, at PAGE ID # 953.) Plaintiff did not apply for a leave of absence. Instead, on November 29, 2013, Plaintiff tendered a two-week notice of resignation. (ECF No. 63–5, at PAGE ID # 956–57.) In that notice, Plaintiff stated that he had been denied outside training and that he had been the victim of "unfair and preferential treatments combined with unfounded accusations." (*Id.*) Plaintiff's notice did not mention his medical issues or his requests for accommodation. (*Id.*)

Although Defendant's third-party leave administrator sent Plaintiff a letter on December 3, 2013, indicating that it believed that Plaintiff might be on a leave of absence and asking him to provide paperwork so that his leave could be approved, Plaintiff did not apply for a leave of absence, and instead continued working without until his two-week notice period expired in mid-December of 2013. (*Id.* at PAGE ID # 953; Tchankpa Dep., ECF No. 63–3, at PAGE ID # 557.) After his employment ended, Plaintiff pursued his workers' compensation claim through administrative proceedings and in the Ohio courts.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). When the moving

10

party has carried this burden, the nonmoving party must then set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

"After the parties have presented their evidence, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party. *Id.* The nonmoving party, however, cannot establish a genuine issue for trial by producing a mere scintilla of evidence in support of its position. *Anderson*, 477 U.S. at 251; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (showing the existence of "some metaphysical doubt as to the material facts" does not create a genuine issue for trial). A genuine issue for trial exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Here, the parties have filed cross–motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, the court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross–motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

11

## III.    ANALYSIS

Plaintiff alleges that Defendant engaged in disability discrimination in violation of the ADA and O.R.C. § 4112.01 (Counts I and II).  Plaintiff further alleges state law claims related to the denial of his workers' compensation benefits (Counts III and IV).  The parties have both moved for summary judgment on all claims.

### A.    ADA and O.R.C. § 4112.01 CLAIMS (Counts I and II)[2]

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination under the ADA includes: (1) taking an adverse action against an employee "on the basis of disability;" and, (2) failing to make reasonable accommodations for the known limitations of an employee with a disability.  42 U.S.C. §§ 12112(a), 12112(b)(5)(A).  Plaintiff alleges claims under both theories of liability.

### 1.    Failure to Accommodate

The United States Court of Appeals for the Sixth Circuit holds that a plaintiff asserting a failure accommodate claim must establish a *prima facie* case by showing that:

> "(1) [he] is disabled within the meaning of the Act; (2) [he] is otherwise qualified for the position, with or without reasonable accommodation; (3) [his] employer knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) the employer failed to provide the necessary accommodation."

---

[2] Because Ohio's anti-discrimination law parallels the ADA, courts use the same framework to analyze claims brought under both statutes. *City of Columbus Civil Serv. Comm'n. v.* McGlone, 82 Ohio St. 3d 569, 573 (1998); *Jakubowski v. Christ. Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010).  The Court's analysis of Plaintiff's ADA claims thus applies to the claims he brings under O.R.C. § 4112.01.

*Judge v. Landscape Forms, Inc.*, 592 Fed. App'x. 403, 407 (6th Cir. 2014) (quoting *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. App'x. 974, 98–83 (6th Cir. 2011)). Claims that allege a failure to accommodate "necessarily involve direct evidence." *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 868–69 (6th Cir.2007). Consequently, if a plaintiff presents direct evidence of an employer's failure to offer a reasonable accommodation, there is no need for a court to utilize the *McDonnell Douglas* burden-shifting formula that is helpful in circumstantial evidence cases. *Id.* at 869.

Plaintiff asserts that Defendant failed to accommodate him by refusing to allow him to work from home three days a week or refusing to transfer him to a position where he could work from home. That claim, however, fails on the fifth prong because the evidence produced at summary judgment is insufficient to show that the requested accommodation— working from home three days a week— was ever medically necessary.

Plaintiff asserts that he began asking Patel if he could work from home three days a week in January of 2013, and that he asked Null the same question in early May of 2013. He further asserts that he provided Defendant with all of his medical records in support of that request. (Tchankpa Dep., ECF 63–3, at PAGE ID # 560, 563, 581–82; Amended Complaint, ¶ 12, ECF No. 22 at PAGE ID # 115–16.) The Court finds, however, that even when drawing all inferences in Plaintiff's favor, the medical records merely show that Plaintiff sought treatment for neck and shoulder pain. But they do not establish that Plaintiff needed to work from home prior to October 10, 2013. None of Plaintiff's medical records prior to Dr. Stacy's October 10, 2013, report contains any work restrictions at all, and a record from a physical therapy session on May 29, 2013, states that Plaintiff told his therapist that he worked with computers daily and that he could perform all his work duties. (ECF No. 70–6, at PAGE ID # 1460.) On this record, the

13

Court cannot conclude that working from home was a medically necessary accommodation prior to October 10, 2013. *See Nance v. Goodyear Tire and Rubber, Inc.*, 527 F.3d 559, 557 (6th Cir. 2008) (finding that plaintiff could not prevail on a failure to accommodate claim because, in part, she failed to produce evidence that her requested accommodations—a safety bar and lighting— were necessary accommodations in light of her physical limitations).

Plaintiff concedes that he had no documented restrictions until Dr. Stacy's October 10, 2013, report. (Tchankpa Dep., ECF 63–3, at PAGE ID # 562, 564.) Plaintiff contends that this is because although Patel told him that he needed to provide his medical documents, Patel did not tell him that he needed to provide "a specific document pertaining to restriction." (*Id.* at PAGE ID # 562.) Nevertheless, the record does not demonstrate that Plaintiff had work restrictions and that Patel failed to ask for them. Rather, the record demonstrates that Plaintiff simply had no work restrictions prior to October 10, 2013. Moreover, Plaintiff bears the burden of establishing that working from home was medically necessary as part of making his *prima facie* case.

The record also fails to demonstrate that Plaintiff needed to work from home after October 10, 2013. Most notably, Dr. Stacy's October 10, 2013, report does not specifically state that Plaintiff was limited to working from home. (ECF No. 63–5, at PAGE ID # 932–35.) Nor do any of the specific limitations in that report establish that working from home was medically necessary. Plaintiff points out that the report indicated that he was limited to lifting no more than ten pounds. (ECF No. 63–5, at PAGE ID # 933.) Plaintiff asserts that the company-provided computers that he had to carry back and forth between work and home weighed thirty pounds. (Plaintiff's Reply, ECF No, 78, at PAGE ID # 2223.) Therefore, Plaintiff contends, his "request to work from home three days a week . . . was implied and justified." *Id.* But even if the Court

14

were to agree that the report reflect that Plaintiff had a reason for asking to work at home after

October 10, 2013, the Court still could not conclude that it demonstrates that working from home

was medically necessary. The lifting restriction is simply too vague to establish that Plaintiff

needed to work from home three days a week instead of, for instance, being issued a second

computer that could be kept at his home or being issued a computer that weighed less. In

addition, Defendant asked Plaintiff to consider seeking a leave of absence, which may have also

accommodated his lifting restriction. *Walsh v. United Parcel Serv.*, 210 F.3d 718, 726 (6th Cir.

2000) (finding that a medical leave of absence can constitute a reasonable accommodation under

appropriate circumstances). A leave may have been a more effective accommodation given that,

if Plaintiff worked from home three days a week, he would have still needed to carry his

computer between work and home two days a week.[3]

    In *McDonald v. UAW-GM Center for Human Res.,* the Sixth Circuit recently found that a

plaintiff failed to demonstrate that her requested accommodation—a longer than normal lunch

break— was medically necessary where the medical documentation was too vague to

demonstrate that the plaintiff needed such an accommodation. No. 17-1875, 2018 WL 3081313,

at * 4 (6th Cir. June 21, 2018). In that case, the plaintiff had a genetic disorder and worked out

regularly at lunch to control pain from a prior surgery. *Id.* at * 1–2. In support of her request for

a longer lunch break, she submitted a letter from her doctor stating: "Please allow [plaintiff] to

---

[3] Although not entirely clear, it appears that Plaintiff told Defendant that he needed to work from home, not because he was limited to lifting less than ten pounds and that his computers weighed more than that, but because he experienced pain while driving. (ECF No. 71–10, at PAGE ID # 1937.) Dr. Stacy's report indicated that Plaintiff could drive a standard vehicle occasionally. And although the record does not reveal whether Plaintiff's commute exceeded that restriction, even if it did, a request to eliminate a barriers that exists outside of the work environment, such as a commute, generally does not constitute reasonable accommodations. *See Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 480 (6th Cir. 2017).

continue strengthening exercises daily for 30 to 60 minutes Monday through Friday." *Id.* at *2. In finding that the plaintiff failed to show that longer lunch breaks were medically necessary, the Sixth Circuit explained that the doctor's letter never indicated that the exercise needed to be done at a particular time or during uninterrupted blocks of time, and thus, the need for longer lunch breaks simply did not follow from the doctor's overly vague letter. *Id.* at *4. Similarly, Plaintiff's requested accommodation in this case, working from home, does not follow from Dr. Stacy's October 10, 2013, report, which is even less specific than the doctor's letter in *McDonald* because Dr. Stacy's report says nothing about working from home.

Plaintiff also asserts that Dr. Stacy's report indicated that he was limited to working eight hours a day with breaks and that Defendant failed to accommodate that known limitation after October 17, 2013. (Tchankpa Dep., ECF 63–3, at PAGE ID # 586.) Plaintiff testified, however, that he was never told that he could not take breaks, he could not recall being prevented from taking breaks, and that he was waiting to hear if breaks would be allowed. (*Id.* at PAGE ID # 586–87.) When considering whether an employer has provided a medically necessary accommodation, an employer is generally not required to act immediately. *Gerton v. Verzon South Inc.,* 145 Fed. App'x. 159, 168 (6th Cir. 2005). Rather, an employee must produce evidence that any "delay in [responding to a] request for accommodation was unreasonable." *Id.* at 169. In this case, after receiving Dr. Stacy's report on October 17, 2013, Defendant attempted to get more specific information about Plaintiff's restrictions, including information about how often he needed breaks, and how long his breaks needed to be. (ECF No. 63–5, at PAGE ID # 936–38.) It also appears that Defendant never received a medical release authorizing Dr. Stacy to provide Plaintiff's medical records until November 5, 2013, and that this thwarted Defendant's efforts to obtain such information. (*Id.* at PAGE ID # 939–41.) In any event,

16

Plaintiff opted not to apply for a leave of absence in mid-November of 2013, and he tendered his resignation on November 29, 2013. (ECF No. 63–5, at PAGE ID # 956–57.) On this record, the Court cannot conclude that Defendant's delay in responding to Plaintiff's request for accommodation after October 17, 2013, was unreasonable.

In sum, the record simply cannot establish that Plaintiff's request to work at home was medically necessary or that Defendant's delay with regard to Plaintiff's break restriction was unreasonable. For that reason, Plaintiff cannot make a *prima facie* case for a failure to accommodate, and thus, Defendant is entitled to summary judgment on that claim.

### 1. Disability Discrimination - Constructive Discharge

Plaintiff also alleges that Defendant violated the ADA by taking an adverse action against him. Specifically, Plaintiff alleges that Defendant constructively discharged him by deliberately creating intolerable working conditions via threats, completely failing to accommodate him, and mishandling Plaintiff's workers' compensation claim.

Plaintiff does not point to any direct evidence of disability discrimination in connection with this claim. To establish a *prima facie* case of discriminatory discharge under the ADA without direct evidence of discrimination, a plaintiff must show that: (1) he was disabled; (2) he was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) his employer knew or had reason to know of his disability; and (5) the position remained open or a non-disabled person replaced him. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012) (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004)). Once a plaintiff makes out a *prima facie* case, the "burden shifts to the defendant to

17

articulate a nondiscriminatory explanation for the employment action." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

The Sixth Circuit has held that constructive discharge qualifies as an adverse employment action under the ADA. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008). Whether an employee can prevail on a constructive-discharge claim "depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Id.* (citation omitted). It also requires a plaintiff to show that the "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* (citation omitted). When determining whether working conditions are that intolerable, courts consider several factors including, but not limited to, "reduction in salary" and "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x. 414, 420 (6th Cir. 2015) (citing *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (quoting *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001)). "Importantly, the employer must have '*deliberately* create[d the] intolerable working conditions . . . with the intention of forcing the employee to quit ' " *Green v. BakeMark USA, LLC,* 683 Fed. App'x. 486, 495–96 (6th Cir. 2017) (citing *Moore v. KUKAWelding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (emphasis added).

Plaintiff claims that Defendant made his working conditions intolerable in several ways. First, on October 2, 2013, Patel threatened to call security and have Plaintiff thrown out of the building after he told Patel that he was going to speak to human resources about his request to work from home. (Plaintiff's Motion, ECF No 71, at PAGE ID # 1733–34; Tchankpa Dep., 63–3, at PAGE ID # 568.) Second, on October 3, 2013, Moore told Plaintiff that he could quit if he

18

was not happy. Third, on October 3, 2013, and while Plaintiff still had no documented restrictions, Lester told Plaintiff that he needed to use paid time off while he was away from work for treatments and that he would be fired if he took time off and he did not cover his time away. (*Id.* at PAGE ID # 568, 580.) Last, Plaintiff claims that Defendant mishandled his workers' compensation claim.

Plaintiff has failed to present a genuine issue of fact regarding these claims. The Court recognizes that even if the comments made by Patel and Moore were unpleasant, those two isolated incidents do not constitute the type of "badgering, harassment, or humiliation" that would compel a reasonable person to resign. Moreover, Plaintiff's interaction with Lester appears to have been intended to inform him about what was required if he needed time away from work during a period when he still had no documented restrictions.

With regard to how Defendant handled Plaintiff's workers' compensation claim, Plaintiff failed to report his workplace injury to Defendant until months after it occurred. In addition, all of Plaintiff's treatments for that injury were covered by his employer-sponsored medical plan until Dr. Stacy sought reimbursement from workers' compensation for Plaintiff's proposed treatment. (Tchankpa Dep., ECF 63–3, at PAGE ID # 575.) That request was denied on October 4, 2013, pending an investigation of Plaintiff's injury, which was impeded by Defendant's inability to obtain a medical records release form from Plaintiff. (ECF No. 73–6, at PAGE ID # 2082; ECF No. 73–5, at PAGE ID # 2078–81.) Defendant also contested the workers' compensation claim in administrative proceedings and in the Ohio courts because it was unclear if Plaintiff sustained his injury at work given that his medical records contain varying information about when and how Plaintiff was injured. (ECF No. 73–8, at PAGE ID # 2084.)

On this record, a reasonable jury could not find that Defendant deliberately made Plaintiff's working conditions intolerable.

Plaintiff also alleges that Defendant constructively discharged him by completely refusing to accommodate him even though Plaintiff repeatedly asked to be allowed to work from home and asked to be transferred to a position where he could work from home at least once. The Sixth Circuit has held that, "a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." *Talley*, 542 F.3d at 1109 (quoting *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993)). As explained above, however, Plaintiff cannot establish that Defendant failed to accommodate him because he has not shown that working from home was medically necessary. Accordingly, Plaintiff has not established that Defendant acted with the requisite deliberateness to state a constructive discharge claim. *Talley*, 542 F.3d at 1109.

Even if Defendant had failed to accommodate Plaintiff, however, Defendant's conduct differs from conduct that could support a constructive discharge claim. In *Talley*, for instance, the Sixth Circuit found that a reasonable juror could find that an employer's conduct was intended to make an employee resign when the employer: (1) denied its employee an accommodation it had provided for years, (2) refused to read a note from the employee's doctor, (3) failed to organize a meeting to discuss the employee's issue, and (4) failed to contact the employee and propose alternative accommodations. *Id.* Defendant did none of these things in this case. Indeed, the record demonstrates that Defendant requested Plaintiff's medical records and worked with him so that he could attend medical appointments; communicated with Plaintiff's doctor and sought additional information after receiving documented restrictions; met with Plaintiff on several occasions to discuss his medical issues; and proposed the possibility of

20

an alternative accommodation by encouraging Plaintiff to apply for medical leave. For these reasons, the record evidence does not show that Defendant acted with the necessary deliberateness and Defendant is, therefore, entitled to summary judgment on Plaintiff's constructive discharge claim.

### 2. Retaliation, Unlawful Medical Inquiry, Hostile Work Environment, And Disparate Treatment

When moving for summary judgment, Plaintiff asserts that Defendant retaliated against him and forced him to submit to an unlawful medical inquiry in violation of the ADA. (Plaintiff's Motion, ECF No. 71, at PAGE ID # 1736.) In addition, Plaintiff asserts hostile workplace[4] and disparate treatment claims in his Reply in Support of his Motions for Partial Summary Judgment (Plaintiff's Reply, ECF No. 78, at PAGE ID # 2230–31.) Plaintiff did not assert any of these four claims in his original or amended complaints. A party cannot assert new legal theories for the first time in a summary judgment motion. *Asher v. Battelle Mem'l Inst.*, No. 2:15-CV-1097, 2016 WL 5661695, at *7 (S.D. Ohio Sept. 30, 2016) (citing *Prunty v. Wilson*, No. 93–3939, 1994 WL 91844, at *1 (6th Cir. March 21, 1994) (new claims asserted by plaintiff for the first time in his motion for summary judgment were not properly presented before the district court)). Nor can a party expand its claims to assert new theories in response to

---

[4] Plaintiff's Amended Complaint uses the word harassment in connection with his constructive discharge claim. (Amended Complaint, ¶27, ECF No. 22, at PAGE ID # 122.) This is insufficient to allege a hostile work environment claim. Nevertheless, Defendant addressed a hostile work environment claim when moving for summary judgment. Although this claim is not properly before the Court, even if it were, Plaintiff would not be able to make his *prima facie* case. To prevail on a hostile work environment claim, Plaintiff would need to show that Defendant's conduct was so severe and pervasive that it altered the conditions of his employment and created an abusive working environment. *Trepka v. Board of Educ.*, 28 Fed. App'x. 455, 461 (6th Cir. 2002). On this record, Plaintiff cannot do so. The only disparaging comments he can point to are the ones made by Patel, Moore, and Lester on October 2, 2013, and October 3, 2013. Even if those three comments were subjectively and objectively offensive, they are not severe or pervasive. Conduct that is merely offensive does not establish a hostile work environment. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

a motion for summary judgment. *Id.* (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). For these reasons, Defendant is granted summary judgment on these claims.

## B. Plaintiff's Remaining State Law Claims (Counts III and IV)

Having granted Defendant summary judgment on Plaintiff's ADA claims, the only claims that remain are Plaintiff's state law claims. In his Amended Complaint, Plaintiff alleges that this Court has "pendant" jurisdiction over those state law claims. (Amended Complaint, ¶ 1, ECF No. 22 at PAGE ID # 112.)[5] Where, as here, a district court dismisses all the claims over which it has original jurisdiction, the court may decline to exercise supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. § 1367(c)(3). The decision whether to exercise supplemental jurisdiction over a state law claim, in an action based solely on this Court's federal question jurisdiction, is purely discretionary and depends on judicial economy, convenience, fairness, and comity. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). As a rule of thumb though,

---

[5] At the summary judgment stage, Plaintiff asserts for the first time that this Court has diversity jurisdiction over his state law claims pursuant to 28 U.S.C § 1332. (ECF No. 69, at PAGE ID # 1003; ECF No. 70, at PAGE ID # 1365.) Plaintiff, however, has lived in Canal Winchester, Ohio, since 2003, and he testified under oath that he was hired to work as a database administrator "at Ascena's home office . . . in New Albany, Ohio." (Tchankpa Dep., ECF No. 63–3, at PAGE ID # 537, 550.) On this record, the Court cannot conclude that the parties are of diverse citizenship. In any event, even if Plaintiff had adequately established a basis for diversity jurisdiction, the Court would likely abstain from proceeding with the state law claims pursuant to the abstention doctrine announced in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), and more fully elaborated in *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 15–16 (1983). The Court takes judicial note that a year prior to bringing this action, Plaintiff filed a parallel proceeding in state court asserting the same theories of recovery under Ohio law against the same Defendant. *See Tchankpa v. Ascena Retail Group, Inc.*, 15-cv-010472, Franklin County Court of Common Pleas, *Complaint*, Nov. 13, 2015. Although it appears that this action has progressed further than the state court action, other considerations weigh in favor of abstention including that the state and federal forums are equally convenient, the state court case was initiated first, and abstention would avoid piecemeal litigation. Most importantly, Ohio law governs the claims, which involve an intersection of Ohio's tort law and its workers' compensation statutes. That factor is particularly compelling in this instance and tips the balance in favor of abstention.

22

"[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc.*, 89 F.3d at 1254–55.

After analyzing the relevant considerations, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. The case has not yet proceeded to trial and the remaining claims implicate questions of Ohio, not federal, law. Such issues are best resolved by an Ohio court. Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, the parties' motion for summary judgment on those claims are **DENIED without prejudice** as moot.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion seeking summary judgment (ECF NO. 73), is **GRANTED** and Plaintiff's motions for partial summary judgment (ECF Nos. 69, 70, 71), are **DENIED**. Defendant's Motion for an Extension of Time to Complete Pre-Trial Filings (ECF No. 80), and Plaintiff's Motion for the Appointment of Counsel (ECF No. 81), are also **DENIED** as moot in light of this Opinion and Order.

**IT IS SO ORDERED.**

8-7-2018
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**